Next case is Utility Associates v. Digital Ally, Inc. As discussed in the briefs, much is made and we believe there is a difference between, in this case, IE or that is and GEG, the example of Latin abbreviation. Here we have the use of IE and we have it only one time. It's used to define the stored and integrated data stream information. It's used to define the data stream. There are other times in the patent when EG is used. But EG in those other times is used to indicate an example. That's what differentiates this patent from the DealerCast case that they rely on. In DealerCast, IE was used so frequently, so many times, that it effectively was converted to EG. That didn't happen here. The patentee was careful to use IE to indicate exactly the stored and integrated data stream that was being defined. Another reason that we know the difference between these is the claim language itself. Claim 1, for example. It recites a server for digitally integrating the captured information into one data stream and storing the data stream in the emergency response vehicle. It carries on and in the where in clause limits the claim to the server is operated to transfer the data stream from the emergency response vehicle to a second location. If something is going to be transferred from somewhere, it must first be present there. Here, that information, the data stream, must first be present in the vehicle. It must be stored in the vehicle, and then it is transferred. The new argument that was created was this idea that the information does not need to be first stored. It could just be the entire information, the data stream, could be directly transferred. Is it your view that the data stream doesn't exist until it's stored? It's our view that the... It exists first, right? That all the information is captured and multiplexed together into a combined data stream, right? And then the data stream is stored. So the data stream exists before it's sent off to storage in the emergency response vehicle. I recognize Your Honor's question to parrot some of the language that is in the patent. It does talk about it, and they rely on that sentence, that it is then stored. However, our position is that in this instance, the patentee defined data stream to be not merely integrated, but integrated and stored. Counsel, you're into your rebuttal time. You wish to save it. You may continue, or we'll save it for you. I'll very quickly, Your Honor, address one other point, and that is the Board's error in reference to what is on line 235. In the Board's opinion, both in rehearing and its primary decision, the Board relied on Monroe at column 23, lines 17 to 33, to determine that some data, or selected portions of data, if you will, could be transmitted live. What happens in lines 17 to 33 is that a command is sent from the cockpit monitor. The cockpit monitor gets only video information. That command goes to the controlling device, or the programmer, and it takes the information via, if you look in the drawing, line 243, to control the data that goes back up to line 231. Line 231 carries only video information. The monitor accepts only video information. The audio is up at 247. It's separated out. In other words, the support being given by the Board for what travels on line 235 actually refers only to what happens on line 231, and what happens on line 231 is video out to the video monitor. That's not proper support. That's a misunderstanding of how Monroe teaches and what Monroe discloses. And so, therefore, we submit that the Board's opinion should be reversed because they've miscomprehended how Monroe operates. Thank you, Your Honor. I'll save the remainder of my time. We will save it for you, Counsel. Ms. Bailey. Thank you, Your Honors. May it please the Court. I want to address first the waiver issue that's presented in our briefing and then go back to the issues that Mr. Shachl presented. First, utility presents five issues for the Court's consideration. Of those two issues, they're the two issues that you just heard. Those two issues have been completely waived. They are completely based on new arguments that utility presented during the oral argument in the IPR and in the request for rehearing filed by utility. And I want to be clear regarding these arguments. They did submit in their Pat Nona response the claim construction that they propose now. And they did submit that Monroe 320 does not teach transmitting all of the information to the remote location. However, every underlying theory, proposition, or argument for these two overarching assertions were newly presented during the oral argument. They have abandoned every argument that was presented in the Pat Nona response for the present appeal. And all of the arguments for these issues in the present appeal were newly presented during the oral argument and the request for rehearing. The Board also confirmed this in the decision denying the rehearing request repeatedly, and I refer the Court to A3, 5-7, and 9. The Court repeatedly identified the new oral arguments and cited to the Office's Patent Trial and Practice Guide where such new oral arguments should not be considered. Utility also even acknowledges in its reply brief at pages 6-7 these new arguments, but justifies the new arguments stating that it provided, quote, further support at oral argument for its positions, and that, quote, timing of the arguments below is of no moment. And I disagree with that. This is problematic for Digital Ally because we have had no opportunity to respond to these new arguments. And more importantly, we did not have an opportunity to develop any rebuttal evidence regarding these new arguments. The parties need to end up at the oral argument in the IPR with the same record evidence that they developed during the briefing stage and throughout the IPR. And I would also refer your courts to, or your honors to, the recent decisions in MCM and Dell that discuss this. This is also not a situation where perhaps one or two of the supporting arguments are new in either the oral argument in the appeal. Again, every single argument on these two issues was brand new in the oral argument. And then this is also not a question where Utility denies that the arguments are new. Instead, the question is whether a party should be able to present new arguments at the IPR oral argument and in the request for a hearing and then rely on those arguments in the appeal. Digital Ally submits the answer to that question as no. I'm sorry, which are the arguments that we're debating over? Yes, the two arguments are the claim construction issues. So whether the claims recite transmitting the data stream from storage in the vehicle as opposed to transmitting the data stream from the vehicle. The board reached that issue, right? The board reached that issue, and that's to my earlier point, Your Honor, where they made the overarching claim construction in their patent owner response, but all the supporting arguments for that overarching claim construction have changed or were changed in the oral argument and in this appeal. Besides claim construction, what is the other? The other is that Monroe 320 does not teach transmitting all of the data to the remote location. And those are the two arguments that Mr. Schatzel presented just a few moments ago. So putting aside the question of waiver late making, where in your petition did you identify Monroe sending the whole of the data to the remote location without going through the storage? So I will refer your honors to... It's in our claim mapping beginning at... 105? 867 is the reference to Monroe 320, and in our petition... Oh, I have it here, Your Honor. Here it is, Your Honor.  Okay. Claim mapping beginning at A105. Apologies. So two points to your issue. First, we did not change our claim construction. If you look at our claim construction in the petition... Put aside claim construction. I'm asking about Monroe. Yes. Where did we recite or disclose that Monroe teaches transmitting all of the information to the remote location? Without going through the storage device. So we do not contend that the claims require going through the storage device. Right. I'm sorry. We're talking across purposes. Assume for purposes of this question that I agree with you that the claim construction does not require the transmission to the remote device to originate in the storage. A transmission can go to both places, remote, onboard, storage. Assume I agree with that. Where did you say in your petition that under that claim construction, Monroe shows that element? And the whole thing. The whole thing. I refer, Your Honors, to A105, and this will also refer back to Monroe at the bottom of column 22 where it begins, each sensor device signal is input into the multiplexer. So column 22 of Monroe, and this is A866, this is also referenced in our petition at A105 in the claim mapping, begins each sensor device signal is introduced into a multimedia multiplexer network. It then goes on to say it produces a combined comprehensive output signal as selected on each of lines 231. Can I just ask you this? Show me, because I'm not seeing it, on 105, where you refer to column 22 of Monroe. So this was actually, I now understand Your Honor's question. This was actually brought up by the board, and the board said that we did identify column 22 in our petition, and that with respect to that particular mapping... There is a third line from the top of 22, from the top on page appendix 105, cites 22, but not for this point. The boxed point talks only about some material on column 23 and column 14 and some figures. So I would also refer to A103 and 104, which quotes pretty much that mapping there, quotes pretty much this entire paragraph. Do you have any further questions on that, Your Honor? No, that's fine, thank you. So we briefly discussed the waiver issue, this change of claim construction, and then this discussion of the live embodiment, and that live is not talked about in our petition. Live was mentioned and brought up and has become an issue in this case because Utility mentioned it and brought it up during the oral argument. And what happened during the oral argument is the patent board essentially caught on to that argument and started asking the Utilities Council regarding, well, isn't there a live embodiment disclosed? And remember, we're talking about this live embodiment because Utility wants to read out, it wants to not apply the broadest reasonable interpretation into the claims and construe the claims to only cover this data dump embodiment, this idea that the data stream has to be stored and that the data stream is stored and then transferred to the remote location. That's referred to in the briefing as the data dump embodiment. Part of why this live issue and live transmission has become an issue is because during the oral argument the board said, well, but isn't there a live transmission embodiment disclosed? So that's how we got to this question of live transmission. And I just wanted to comment on that because Mr. Schatzel said that we did not discuss it in the petition. We did not discuss it because we did not believe that a claim construction required storing the, or transmitting the data stream from storage. But the description right at the beginning of the petition, the kind of summary description of what the patent issue is about, sure reads as though it's a description of putting stuff in storage and sometime later taking it out of storage to send somewhere else. We don't disagree that that is an embodiment disclosed. The issue is what is the broadest reasonable interpretation of the claims and the plain reading of the claims that is transmitting the data stream from the vehicle. Another feature of this invention is the idea that you can capture this data in a mobile environment. So it makes sense that a part that the claims recite that you're going to capture the data in the mobile environment, in other words, the vehicle, and transmit it from the vehicle to the remote location. So I don't disagree with you that the 556 patent discloses and talks about storing in the vehicle, but it also talks about transmitting data from the vehicle, from the mobile, to the remote location, and that was what was emphasized in the claims. And I would perhaps ask your honors, they have put a definition of data stream has to be stored. If that is the correct definition, then what is the point in Claim 1 of reciting storing the data stream? If the data stream is already stored information, then it's just redundant to simply recite storing the data stream. We propose that the construction be that the data stream does not have to be stored and that the embodiments, both the live transmission embodiment that we talk about now and also the state of dump embodiment, would then both be covered by the claims. Let's also, just because your honors are focusing on the claim construction issue, let's talk about this just a little bit more and bring up what happened during the prosecution history. During the prosecution, the patentee amended Claim 12, which is now Claim 14, to recite that the information, the captured information, is stored. That amendment did not result in allowability of the claims. In the next amendment, they removed the stored concept and replaced it with the data stream. In other words, at one point they did amend the claims to say transmitting stored information. But then they got rid of that amendment and now the claims do not recite that. Is there any explanation in the remarks section of their office action response on why they deleted stored data and replaced it with data stream? There is not. However, if you look at the second amendment and the structural limitations that were put in, that's when they went from transmitting captured information and integrated captured information to clarifying that it's integrated into one data stream. But there are no explanatory remarks. I also would point the court to A51, which is the 556 at column 4, lines 36 through 38. This is the paragraph that's talking about muxing the information together using the multiplexer codec and that you get the integrated information. It says that the information is integrated into the one data stream and then stored. Also implying that a data stream exists upon integration of the information and then that data stream is later stored. That works against their proposed definition that data stream must be defined as being stored information. Anything further, counsel? I don't think I do, your honor. I was just making sure. Thank you. Thank you. Mr. Schoetzel has two and a half minutes left. Thank you, your honor. Judge Toronto, in reference to your question, I too have looked to see where Monroe was cited, in particular that section of Monroe. We did not find it in the petition for any transmission element. We did not find the teaching of Monroe relating to 231, 233 and 235 for a transmission step. We did find it for storing and integrating steps, but not for transmission. And that's why we think that we have not had a fair opportunity to address that. In terms of the waiver question, the board did reach these issues. The board did address them. And the board addressed them in a fashion that was robust. Yes, as Ms. Bailey says, the board said that no new argument, as is typical and often happens in PTAB decisions, no new argument could be raised at the oral hearing. It then went ahead and addressed each of those issues. Can I just get back to this one thing that I guess I was focused on a little bit? My recollection is that the board, at least on rehearing, maybe in the original, I'm not sure, relied in finding in Monroe transmission of the whole data stream not coming out to the remote location, I guess the land transceiver or wherever the aircraft radio was sending it, in reliance on a portion of Monroe that the petition does highlight at Appendix 105, namely the portion that says, where desired selected portions of the system's data may be sent through 246. And if it's going through 246, then it's coming out of 235. 246 is just the outflow, where 235 is the inflow. I don't know that I necessarily agree with that, Your Honor. I don't believe that 246 in Monroe is mentioned one time. It is mentioned at that one instance where you cite it. Right, but in the figure, it's what's coming out of the data transceiver to the aircraft radio, and 235 is what's going from the whole muxing thing into the data transceiver. Yes, Your Honor. So you can, I think the board interpreted it that way, and also interpreted, I know you disagree with this, but interpreted the selected portions to include the entirety. We do disagree, and that's correct. But if that's the basis on which the board relied, and if I were to disagree with you that there was nothing improper about that interpretation of Monroe, then that's a point that is actually in their petition. It's not column 22 in that box, but it is the point that is in that box. I'd have to go back and look to be certain, Your Honor. Well, they quote it. I'm just looking at it. That's the passage that they quote in the box. Thank you. What we then have to do is we have to read the entire paragraph in which the selected portions in the Monroe language that you just cited, in that paragraph we have to read the entire paragraph, because what it says is when you get down to the last few lines, 17 to 33, 17 to 33 explains that what happens there is at the cockpit monitor, you send a command to the controller. The controller then works back through line, if I remember correctly, 243, to influence what video you are selecting to now be sent out over 246. In other words, it may well be in their petition, and the board did cite it, but it doesn't show that all data goes out 246. At best, what it shows is that you can select video data that would go out onto 246, because the last part of that paragraph limits the disclosure or any combination, as it calls it, to what goes out on 246, and it's only video data. So, for example, it's not audio, which means you're not transmitting all data. Thank you. Thank you, counsel. Thank you, Your Honor. Case on revisement.